UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 06-10116-RGS

UNITED STATES OF AMERICA

v.

ROBERT PROSPERI, GREGORY STEVENSON,
GERARD MCNALLY, MARC J. BLAIS,
JOHN J. FARRAR, and KEITH THOMAS

MEMORANDUM AND ORDER ON DEFENDANTS'
MOTION TO DISMISS CERTAIN COUNTS
OF THE SUPERSEDING INDICTMENT AS TIME-BARRED

August 29, 2008

STEARNS, D.J.

In this case, the court is asked to determine whether the United States is presently at war, and if so, with whom.  Defendants are charged with conspiracy, mail fraud, and the making of false statements in connection with the federally-financed Central Artery Tunnel Project (CA/T).  Defendants' criminal acts are alleged to have begun in 1999.  The indictment was returned on May 3, 2006, and superseded on June 28, 2006.[1]  On June 29, 2007, defendants moved to dismiss the majority of the counts of the indictment as time-barred.[2]  Hearings on this and a number of related motions, including evidentiary motions

---

[1]The superseding indictment charges defendants with one count of conspiracy to commit highway project fraud and mail fraud, 18 U.S.C. § 371, one count of conspiracy to defraud the government, 18 U.S.C. § 286, eighty-three counts of highway project fraud, 18 U.S.C. § 1020, and thirty-nine counts of mail fraud, 18 U.S.C. § 1341.

[2]Defendants also filed a motion challenging the highway project fraud counts under 18 U.S.C. § 1020 as unconstitutional as applied or as void for vagueness.  The court denied that motion in an Order dated November 21, 2007.

to suppress, were held over the fall of 2007. This is the last of the court's decisions in anticipation of trial.

BACKGROUND

The CA/T project, colloquially known as the "Big Dig," is a multi-billion dollar interstate highway construction project. The CA/T involves the building or reconstruction of nearly eight miles of highway bisecting the City of Boston, almost half of it underground. The underground segment of the project requires the construction of tunnel walls, base slabs, and roof slabs made in whole or in part from concrete. The project specifications prohibit the addition of water to the concrete after it is mixed or "batched." The specifications also require that the concrete be installed within ninety minutes of batching. To enforce compliance with the ninety-minute rule, contractors are required to submit batch reports for each truckload of delivered concrete. The reports include the date and time of the batching. Contractors are warned that knowingly submitting false reports may be punished by criminal sanctions.

Defendants are former employees of Aggregate Industries, N.E. (Aggregate), a major concrete supplier to the CA/T. Defendants are accused of recycling stale and adulterated concrete, and submitting false batch reports to conceal their fraud. Approximately 5,000 of the 500,000 concrete loads that Aggregate delivered to the CA/T are alleged to have failed to conform to contract specifications.[3]

DISCUSSION

---

[3]Aggregate's concrete is not implicated in the July 10, 2006 ceiling collapse in the eastbound Interstate 90 tunnel, which killed Milena Delvalle, a transiting motorist.

Defendants contend that the acts of highway project fraud and mail fraud alleged to have been committed prior to May 3, 2001 (eighty-five counts in total), are barred by the five-year federal statute of limitations.[4]  The government, for its part, maintains that these counts are saved by the Wartime Suspension of Limitations Act (Suspension Act), 18 U.S.C. § 3287.  The government argues that the Suspension Act tolled the running of the statute of limitations as of September 18, 2001, the date on which Congress authorized the use of military force against the Taliban government of Afghanistan; or alternatively, as of October 10, 2002, the date of the authorization of the use of military force in Iraq.[5] The Suspension Act provides (with appropriate emphasis) as follows.

> *When the United States is at war the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not,* or (2) committed in connection with the acquisition, care, handling, custody, control or disposition of any real or personal property of the United States, or (3) committed in connection with the negotiation, procurement, award, performance, payment for, interim financing, cancellation, or other termination or settlement, of any contract, subcontract, or purchase order which is connected with or related to the prosecution of the war, or with any disposition of termination inventory by any war contractor or Government agency, *shall be suspended until three years after the termination of*

---

[4]The disputed counts are:  Counts 3-24, 29-37, 44-60, and 69-74, all under 18 U.S.C. § 1020; Counts 86-94, 98-103, 107-119, and 126-128, all under 18 U.S.C. § 1341. Defendants acknowledge that the remaining forty-two false statement and twenty-eight mail fraud counts are alleged to have been committed within five years of the date of the original indictment.

[5]At the hearing on the motion, there was also discussion of a global "war" on terrorism, waged principally against Osama bin Laden and al Qaeda.  The use of the metaphor of war to describe the struggle against terrorism has been criticized.  See Sir Adam Roberts, The 'War on Terror' in Historical Perspective, 47 SURVIVAL 101-130 (Summer 2005).  I do not understand the government to be pressing the argument that the United States is "at war" with al Qaeda, at least in any traditional legal sense.

*hostilities as proclaimed by the President or by a concurrent resolution of Congress.*

18 U.S.C. § 3287.  Defendants, for their part, argue that the Suspension Act does not apply because: (1) the United States is not currently "at war" within the meaning of the Act; and even if it were, (2) the mail fraud and false statement charges do not fall within the scope of the Act because the alleged criminal acts were not related to military procurement.[6]

Neither 18 U.S.C. § 1020, nor 18 U.S.C. § 1341, contain an offense-specific statute of limitations.  Consequently, the default five-year limitations period for federal criminal offenses applies.  <u>See</u> 18 U.S.C. § 3282.  The limitations period begins to run when each of the elements of an alleged offense has been satisfied.  <u>See</u> <u>Toussie v. United States</u>, 397 U.S. 112, 115 (1970); <u>United States v. Walsh</u>, 928 F.2d 7, 11 (1st Cir. 1991); <u>United States v. Mubayid</u>, __ F. Supp. 2d __, 2008 WL 2856415 (D. Mass. July 24, 2008).  For false statements under § 1020,  the offense is complete when a defendant presents the false statement to the government.[7]  For the crime of mail fraud under § 1341, the

---

[6]  The CA/T project is a civilian construction project that has no relationship, direct or indirect, with the conflicts in Afghanistan and Iraq.  The government does not contend otherwise.

[7]The statute provides in relevant part:

Whoever knowingly makes any false statement, false representation, false report, or false claim with respect to the character, quality, quantity, or cost of any work performed or to be performed, or materials furnished or to be furnished, in connection with the construction of any highway or related project approved by the Secretary of Transportation . . . [s]hall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1020.

4

limitations period begins to run once the offending article – in this case, an invoice – is placed in the United States mails.[8]  Each offense under § 1020 and § 1341 is distinct. Thus, the limitations period for each offense runs separately.

<u>Any Offense Involving Fraud Against the United States</u>

In their initial volley, defendants contend that the Suspension Act is limited to war-time frauds and "offenses in which defrauding or attempting to defraud the United States is an essential ingredient of the offense charged." <u>Bridges v. United States</u>, 346 U.S. 209, 221 (1953).  An insurmountable obstacle, however, is <u>United States v. Grainger</u>, 346 U.S. 235 (1953), holding that the Suspension Act tolled the limitations period on a decidedly unmilitary World War II-era conspiracy to defraud the Commodity Credit Corporation (CCC).  The United States owned shares in the CCC, a privately-run enterprise

---

[8]The mail fraud statute provides in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341.

incorporated in Delaware.  The indictment alleged that defendants attempted to finagle payments for imaginary or inflated purchases of wool in a scheme that had no discernible connection to the war effort.  To that fact the Supreme Court gave short shrift, focusing instead on the "pecuniary nature" of the alleged fraud – a term to which it gave special interpretive significance.  The Court found that the false statements – inducing or attempting to induce payments from the government – involved "the element of deceit that is the earmark of fraud," and were thus "pecuniary in nature."  Grainger, 346 U.S. at 243. The Court distinguished Bridges, supra (the case on which defendants rely), noting that the false statements at issue in Bridges – denials under oath of membership in the Communist Party – did not include the pecuniary element the Suspension Act requires. Grainger, 346 U.S. at 242-243.[9]  See Bridges, 346 U.S. at 222 (the purpose of the Suspension Act "is not that of generally suspending the three-year statute, e.g., in cases of perjury, larceny and like crimes.  It seeks to suspend the running of it only where the fraud against the Government is an essential ingredient of the crime.").  Here, defendants' alleged fraud was indisputably "pecuniary in nature" – creating false batch reports in order

---

[9]The distinction had been foreshadowed by a line of Supreme Court precedent. See Marzani v. United States, 335 U.S. 895 (1948), aff'g by an equally divided Court, 168 F.2d 133 (D.C. Cir. 1948) (Suspension Act did not apply to false statements to the Civil Service Commission and the FBI in seeking federal employment); United States v. Scharton, 285 U.S. 518 (1932) (same, false swearing in the preparation of income tax returns); United States v. McElvain, 272 U.S. 633 (1926) (same); United States v. Noveck, 271 U.S. 201 (1926) (same).

to procure payments from the government.   Therefore, the <u>Bridges</u> "non-pecuniary"

exception to the Suspension Act does not apply.[10]

In light of <u>Grainger</u>, it makes no difference that the fraud in this case involved a

construction project unrelated to the Iraqi or Afghani conflicts.   In the few cases since

<u>Grainger</u> in which the government has successfully invoked the Suspension Act, the

absence of a connection between the fraud and wartime procurement has played no part.

<u>See</u> <u>United States v. Lurie</u>, 222 F.2d 11, 15 (7th Cir. 1955) (conspiracy to defraud the

United States in connection with the liquidation of surplus war property); <u>United States v.</u>

<u>Salvatore</u>, 140 F. Supp. 470, 473 (E.D. Pa. 1956) (false lumber invoices); <u>United States</u>

<u>v. Strange Bros. Hide Co.</u>, 123 F. Supp. 177, 184 (N.D. Iowa 1954) (false wool invoices

to the CCC).

<u>At War</u>

Defendants next argue that the United States is not "at war" within the meaning of

the Suspension Act.  As the parties recognize, Congress has not exercised its power under

Article I, Section 8, clause 11 of the United States Constitution to "declare war."[11]  Aside

from a formal declaration of war, the Suspension Act gives no explicit indication of the type

of military action that Congress intended to trigger a tolling of a limitations period under

---

[10]For cases finding the absence of a "pecuniary" element, <u>see</u> <u>United States v.</u>
<u>Obermeier</u>, 186 F.2d 243, 257 (2d Cir. 1950) (false statement in citizenship proceeding);
<u>United States v. Shoso Nii</u>, 96 F. Supp. 971, 972-973 (D. Haw. 1951) (passport
procurement fraud); <u>McGuinness v. United States</u>, 77 A.2d 22, 24-25 (Mun. Ct. App. D.C.
1950) (uttering checks payable to the Treasurer of the United States).

[11]Despite a history of U.S. military involvements overseas, Congress has only five
times formally declared war (most recently after the Japanese attack on Pearl Harbor in
1941).

the Act.  As a result, this case requires the court to make the determination of what it means for the United States to be "at war" within the meaning of the Act.

The judicial branch has a constitutionally-based policy of abstaining when "a question [is] too fraught with gravity even to be adequately formulated when not compelled." Ludecke v. Watkins, 335 U.S. 160, 169 (1948).  The reluctance to assay into "political thickets," see Baker v. Carr, 369 U.S. 186 (1962), is rooted in the case or controversy requirement of Article III and the Court's original understanding that the Constitution does not authorize it to render advisory opinions, even when requested to do so by the political branches.  1 Lawrence H. Tribe, American Constitutional Law, 313 (3d ed. 2000).  See Marbury v. Madison, 1 Cranch 137, 169-170 (1803) (There are "peculiarly irksome" and "delicate" "[q]uestions, in their nature political . . .  which are, by the Constitution and laws, submitted to the executive [and] can never be made to this court.").


One might think of this case – which involves a political issue of great sensitivity – as one counseling abstinence.  There are cases, however, that leave no choice to a court but to interpret statutory or contractual language that depends  on the determination of the existence of a declared or undeclared state of war.[12]  See Lee v. Madigan, 358 U.S. 228 (1959) (statute denying courts-martial jurisdiction for murder or rape during a "time of peace"); Koohi v. United States, 976 F.2d 1328, 1335 (9th Cir. 1992) (whether the naval

---

[12]"[R]ecognition of belligerency abroad is an executive responsibility, but if the executive proclamations fall short of an explicit answer, a court may construe them seeking, for example, to determine whether the situation is such that statutes designed to assure American neutrality have become operative."  Baker, 369 U.S. at 212-213.

protection of oil tankers in the Persian Gulf during the Iran-Iraq war constituted combat "during time of war" for purposes of the Federal Tort Claims Act); United States v. Sobell, 314 F.2d 314, 329 (2d Cir. 1963) (collateral review of a sentencing enhancement for espionage "in time of war"); New York Life Ins. Co. v. Bennion, 158 F.2d 260, 265 (10th Cir. 1946) (insurance policy excluding coverage for death resulting from "war or any act incident thereto"); Syquia v. United States, 124 F. Supp. 638, 644 (Ct. Cl. 1954) (lease agreement in effect for the "duration of the war").

The question posed here is the meaning of the phrase "at war" as it appears in the Suspension Act. So framed, the question would appear to be one of straight-forward statutory construction. There are numerous statutes in the United States Code that take effect only in times of war. See, e.g., 10 U.S.C. § 2538(c) (authorizing the President to seize "any plant that is equipped to manufacture, or that . . . is capable of . . . manufacturing" war material "in time of war or when war is imminent"); 10 U.S.C. § 2644 ("In a time of war, the President . . . may take possession and assume control of all or part of any system of transportation to transport troops, war material, and equipment, or for other purposes related to the emergency."); 10 U.S.C. § 2663(b)(2) ("In time of war or when war is imminent, the United States may, immediately upon the filing of a petition for condemnation under paragraph (1), take and use the land to the extent of the interest sought to be acquired."); 18 U.S.C. § 2388(a) ("Whoever, when the United States is at war, willfully causes or attempts to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States, or willfully obstructs the recruiting or enlistment service of the United States, to the injury of the service or the United States, or

9

attempts to do so [shall be punished].").[13]  Ordinarily, when Congress "uses the same term in the same way in two statutes with closely related goals, basic canons of statutory construction suggest a presumption that Congress intended the term to have the same meaning in both contexts."  New Hampshire v. Ramsey, 366 F.3d 1, 26 (1st Cir. 2004). The parties, however, have not identified – nor has the court uncovered a statute comparable to the Suspension Act with its unusual mix of a pecuniary element with an "at war" requirement.[14]

_____

[13]The Federal Tort Claims Act (FTCA), specifically withholds a waiver of sovereign immunity for "[a]ny claim arising out of combatant activities of the military or naval forces, or the Coast Guard, during time of war" 28 U.S.C. § 2680(j).

[14]Article 43(f) of the Uniform Code of Military Justice (UCMJ) is, however, a close approximation.  It provides that "[w]hen the United States is at war, the running of any statute of limitations applicable to any offense under this chapter . . . involving fraud or attempted fraud against the United States or any agency thereof in any manner . . . is suspended until three years after the termination of hostilities as proclaimed by the President or by a joint resolution of Congress."  In United States v. Taylor, 15 C.M.R. 232 (C.M.A. 1954), the defendant was convicted after trial by a court-martial of fraudulent enlistment in the United States Army.  On appeal, he challenged the prosecution as time-barred.  The government invoked the tolling provision of Article 43(f).  The Court of Military Appeals found that the offense was pecuniary in nature because it required as an element of proof the establishment of a monetary loss to the United States in the form of pay and allowances.  The Court rejected defendant's argument that the Korean Conflict did not trigger the tolling provision of Article 43(f) because it was not a formally declared war.  As the Court observed

[t]he enormity of the action – as attested by the number of troops concerned, the number of casualties, and the large sums spent in equipping and maintaining these forces – presented as frequent opportunity for fraud as would have existed had the conflict been designated a "war" instead of a "police action."  Our law-enforcement agencies appear to have been occupied busily during the period with the detection of espionage and subversion. The suddenness and surprise of the initial Communist onslaught distinctly served to provide a setting for that disorganization in which fraud might thrive. . . . We consider that recent civilian cases support our position that the Korean fighting placed this country "at war" within the meaning of

The canons of construction dictate that "courts must presume that a legislature says in a statute what it means and means in a statute what it says." <u>Barnhart v. Sigmon Coal Co., Inc.</u>, 534 U.S. 438, 461-462 (2002) (internal quotation omitted). "[W]hen a statute speaks with clarity to an issue[,] judicial inquiry into the statute's meaning, in all but the most extraordinary circumstances, is finished." <u>Estate of Cowart v. Nicklos Drilling Co.</u>, 505 U.S. 469, 475 (1992). "In other words, the court need not consult legislative history and other aids to statutory construction when the words of the statute neither create an ambiguity nor lead to an unreasonable interpretation." <u>Riva v. Commonwealth of Massachusetts</u>, 61 F.3d 1003, 1007 (1st Cir. 1995). But "[t]he notion that because the words of a statute are plain, its meaning is also plain, is merely pernicious oversimplification." <u>United States v. Monia</u>, 317 U.S. 424, 431 (1943) (Frankfurter, J., dissenting). "There is no surer way to misread any document than to read it literally." <u>Guiseppi v. Walling</u>, 144 F.2d 608, 624 (2d Cir. 1944) (L. Hand, J., concurring).

Here, although the words "at war" may, in a general sense, mean exactly what they say, their meaning in the specific context of the Suspension Act – a tolling statute – is not

---

Article 43(f).

<u>Taylor</u>, 15 C.M.R. at 237-238. Although opinions of the military courts are not binding on this court, there are obvious parallels between the arguments made by the <u>Taylor</u> defendant and those made by defendants in this case. In most respects, I find the <u>Taylor</u> opinion persuasive.

as certain as might appear at first blush.[15]  "Congress in drafting laws may decide that the

Nation may be 'at war' for one purpose, and 'at peace' for another."  Lee, 358 U.S. at 231.

The "at war" clause of the Suspension Act has not been the subject of extensive

judicial review – in fact only one district court has been called upon recently to decide its

meaning.  That court determined that the Act's tolling provisions apply only when Congress

exercises its Article I power to formally declare war.  See United States v. Shelton, 816 F.

Supp. 1132 (W.D. Tex. 1993).  In Shelton, a Texas state official was indicted for conspiring

to commit bribery and for misapplying federal funds.  The indictment involved a scheme

in which Shelton (the defendant) funneled federal money to a company as a *quid pro quo*

for the hiring of a relative of one of his colleagues.  Shelton raised a statute of limitations

defense to which the government, citing the first Gulf War, interposed the tolling provisions

of the Suspension Act.  The district court dismissed the government's arguments,

concluding that "[f]or the Persian Gulf conflict to have amounted to a war under 18 U.S.C.

§ 3287, Congress should have formally recognized that conflict as a war."  Shelton, 816

F. Supp. at 1135.

In explaining its decision, the court stated:

[t]he Congressional intent underlying the Suspension Act appears to have
been more directly concerned with such massive and pervasive conflicts as
World War II.  Indeed, there appear to be no reported decisions of civilian
courts in which the Suspension Act was applied during any of the "wars"
involving the United States that have occurred since World War II.  The

---

[15]That the Suspension Act is a tolling statute is of some significance.  Statutes of
limitations are favored by the law and courts are to interpret them in favor of a finding of
repose because of the salutary effect on the just enforcement of the criminal laws.  See
Toussie, 397 U.S. at 114-115.  A court nonetheless must respect a legislative choice to
carve out an exception to this equitable judicial policy.

> Vietnam War was arguably a much more intrusive and lengthy conflict than
> the recent conflict in the Persian Gulf area, but the Suspension Act does not
> appear to have ever been used for any offenses that occurred during the
> Vietnam War.

Id. While there is some force to the Shelton court's Vietnam War analogy, its reasoning rests essentially on the concept of desuetude.[16]  The Suspension Act, this court agrees, has been rarely used, but it has not been invoked so infrequently as to suggest a national consensus that it should be impliedly repealed.  See Kennedy v. Louisiana, 128 S.Ct. 2641, 2657-2658 (2008) ("After reviewing the authorities informed by contemporary norms, including the history of the death penalty for this and other nonhomicide crimes, current state statutes and new enactments, and the number of executions since 1964, we conclude there is a national consensus against capital punishment for the crime of child rape.").[17]  The government should not be penalized for invoking a criminal statute sparingly (or judiciously):  car hijacking, for example, is a federal offense that is not often prosecuted

_____

[16]Desuetude:  "The doctrine holding that if a statute or treaty is left unenforced long enough, the courts will no longer regard it as having any legal effect even though it has not been repealed."  BLACK'S LAW DICTIONARY 479 (8th ed. 2004).  "[T]he doctrine of desuetude has had in all legal systems a very limited and cautious application.  For the anachronistic statute a better remedy may be found through reinterpretation in the light of new conditions; as Gray remarks with some irony:  'It is not as speedy or as simple a process to interpret a statute out of existence as to repeal it, but with time and patient skill it can often be done.'"  LON L. FULLER, ANATOMY OF THE LAW 38 (1968), quoting JOHN CHIPMAN GRAY, THE NATURE AND SOURCES OF LAW 192 (1921).

[17]See also Fort v. Fort, 12 Mass. App. Ct. 411, 417 (1981) ("Despite widespread official knowledge of . . . violations [of the criminal adultery statute], prosecutions by law enforcement officials are essentially non-existent. . . .  It seems beyond dispute that the statutes defining or punishing [such] crimes . . . have fallen into a very comprehensive desuetude.").  But see Commonwealth v. Stowell, 389 Mass. 171, 175 (1983) (adultery statute not unconstitutional as applied even though adultery is rarely made the subject of criminal prosecution).

in the federal courts – not because federal prosecutors deem it insufficiently serious – they do not – but because the Department of Justice (DOJ) has been selective in invoking the statute out of deference to the parallel (and sometimes competing) interests of their State counterparts.  The decision to assert the tolling provisions of the Suspension Act in a similarly prudential manner may reflect a political choice by federal authorities, or may simply reflect the fact that the government in most cases is able to act  with sufficient alacrity to avoid the necessity of resorting to the Act's tolling provisions.

This court also believes that Shelton reads the Suspension Act to incorporate a condition precedent that is not found in its text or legislative history.  Under the  Shelton reading, only a war on a "massive and pervasive" scale (like World War II), that is sufficient to provoke Congress into a formal declaration of war (and does so) triggers the Act.  The Shelton formulation thus does not capture the Korean War or the Vietnam War, two of the largest, bloodiest, and most expensive military campaigns in our nation's history (nor does it capture the conflicts in Iraq and in Afghanistan).  Moreover, it does not answer very persuasively the question of why the Act is to take effect when Congress declares a war that is neither massive nor pervasive, say against Mexico or Spain, and yet not when Congress stops short of a formal declaration in more formidable circumstances like Korea and Vietnam.

The Shelton reading of the Suspension Act would be defensible if there was some indication in the Act (or its legislative history) that Congress meant the tolling provision to apply only during declared wars of an all-consuming nature like the Second World War. But there is not.  Had Congress intended the phrase "at war" to serve as a limitation, it

14

would have written the modifier "declared" into the Act as it has in other statutes.  <u>See</u>, <u>e.g.</u>, 28 U.S.C. § 2416(d) (tolling provision for civil claims by the United States seeking money damages applies only when "the United States is in a state of war declared pursuant to article I, section 8, of the Constitution of the United States."); 50 U.S.C. § 1829 ("Notwithstanding any other provision of law, the President, through the Attorney General, may authorize physical searches without a court order . . . to acquire foreign intelligence information for a period not to exceed 15 calendar days following a declaration of war by the Congress.").

Moreover, there is no compelling logic connecting a formal declaration of war with the state of *being at war*.  Even taking an originalist view of the Constitution, the logic cannot be defended.  The idea that our nation could be at war, even without a formal declaration by Congress, was recognized by the Supreme Court at the nascency of the Republic.  In <u>Bas v. Tingy</u>, 4 U.S. (4 Dall.) 37 (1800), the Supreme Court was called upon to decide whether the Quasi-War with France (1798-1800) was in fact a war, despite the absence of a formal declaration of war by Congress.  The decision was necessary to resolve ownership rights to ships and cargo recaptured by U.S.-commissioned vessels from French privateers.  The unanimous Supreme Court, writing seriatim, found it irrelevant whether the conflict was a "perfect" (i.e., a declared) war, or an "imperfect" one.

> If [war] be declared in form, it is called solemn, and is of the perfect kind . . . . But hostilities may subsist between two nations more confined in its nature and extent; being limited as to places, persons, and things; and this is more properly termed imperfect war; because not solemn [that is, not declared], and because those who are authorized to commit hostilities, act under special authority, and can go no farther than to the extent of their commission. . . . [I]t is said, that a war of the imperfect kind, is more properly

> called acts of hostility, or reprisal, and that congress did not mean to consider the hostility subsisting between France and the United States, as constituting a state of war. . . .  [However,] the degree of hostility meant to be carried on, was sufficiently described without declaring war, or declaring that we were at war.  Such a declaration by congress, might have constituted a perfect state of war, which was not intended by the government.

See id., at 40-41 (Washington, J.) (internal emphasis omitted).  Instead, the Court focused on the presence of the indicia of war.

> In March 1799, congress had raised an army; stopped all intercourse with France; dissolved our treaty; built and equipt ships of war; and commissioned private armed ships; enjoining the former, and authorising the latter, to defend themselves against the armed ships of France, to attack them on the high seas, to subdue and take them as prize, and to re-capture armed vessels found in their possession.  Here, then, let me ask, what were the technical characters of an American and French armed vessel, combating on the high seas, with a view the one to subdue the other, and to make prize of his property?  They certainly were not friends, because there was a contention by force; nor were they private enemies, because the contention was external, and authorised by the legitimate authority of the two governments.  If they were not our enemies, I know not what constitutes an enemy.

Id. at 41.   See also Prize Cases, 67 U.S. (2 Black) 635, 668 (1862) ("[W]ar may exist without a declaration on either side.").

The United States has not declared war in any conflict since World War II, despite prolonged engagements in Korea, Vietnam, Kosovo, Afghanistan, and Iraq (twice) and shorter deployments in Panama, Grenada, Haiti, and Somalia, among others.  Vietnam, the second invasion of Iraq, and the invasion of Afghanistan were undertaken instead by legislative authorization – the Gulf of Tonkin Resolution and the Authorization for Use of Military Force (AUMF) that stopped short of formal declarations of war.  The Korean conflict, which was characterized by President Truman and the United Nations as a "police

action," was neither a declared war nor authorized as such by Congress.  Rather, the United Nations Security Council sanctioned the multilateral use of military force.  See S.C. Res. 83, 5th Sess., 474th mtg., U.N. Doc. S/RES/83 (June 27, 1950) (denouncing the North Korean attack as a "breach of the peace" and "recommend[ing]" that U.N. member states "furnish such assistance to the Republic of Korea as may be necessary to repel the armed attack and to restore international peace and security in the area.").  The use of force in the first Iraq war was also authorized by the United Nations (and later by Congress).  See S.C. Res. 678, 45th Sess., 2963d mtg., U.N. Doc. S/RES/678 (Nov. 29, 1990) (authorizing U.N. member states "to use all necessary means [against Iraq] to . . . restore international peace and security in the area."); Authorization for Use of Military Force Against Iraq Resolution, H.R.J. Res. 77, 102d Cong., 1st Sess. (1991), enacted as Pub. L. No. 102-1, 105 Stat. 3, 4 (1991) (authorizing the use of force against Iraq "pursuant to United Nations Security Council Resolution 678.").

Also to be considered is the War Powers [Act] Resolution (WPR) of 1973.[18]  The WPR allows the President to send U.S. armed forces into action abroad pursuant to either a declaration of war *or* a statutory authorization of Congress arising from an immediate attack or a serious threat of attack.[19]  The Supreme Court, for its part, has found that the

---

[18]Enacted over President Nixon's veto, the WPR requires the President to consult with Congress "in every possible instance" before sending United States armed forces into combat abroad and to report to Congress within forty-eight hours of the onset of any hostilities arising from an immediate attack or threat.  The President must terminate the military engagement if Congress does not subsequently ratify the use of force within sixty days.  See 50 U.S.C. §§ 1542-1543.

[19]See 50 U.S.C. § 1541(c) ("The constitutional powers of the President as Commander-in-Chief to introduce United States Armed Forces into hostilities, or into

laws of war, including the right of the nation to take preemptive military action in self-defense (*jus in bello*), apply to non-declared wars like that in Afghanistan.  See Hamdi v. Rumsfeld, 542 U.S. 507, 518 (2004) (the detention of captured enemy combatants in Afghanistan for the duration of the conflict is a fundamental and accepted incident of the rules of war).[20]

Other courts have similarly resisted reading a declaration of war requirement into the terms "at war" or "during time of war" as they are used in other statutes.  For example, the FTCA explicitly bars suits against the United States for "[a]ny claim arising out of combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j).  Various courts have construed the phrase "time of war" as it is used in the FTCA as to not require an express Congressional declaration of war.  See Koohi v.

---

situations where imminent involvement in hostilities is clearly indicated by the circumstances, are exercised only pursuant to (1) a declaration of war, (2) specific statutory authorization, or (3) a national emergency created by attack upon the United States, its territories or possessions, or its armed forces.").

[20]The Hamdi Court further explained:

If the practical circumstances of a given conflict are entirely unlike those of the conflicts that informed the development of the law of war, that understanding may unravel.  But that is not the situation we face as of this date.  Active combat operations against Taliban fighters apparently are ongoing in Afghanistan.  The United States may detain, for the duration of these hostilities, individuals legitimately determined to be Taliban combatants who "engaged in an armed conflict against the United States." If the record establishes that United States troops are still involved in active combat in Afghanistan, those detentions are part of the exercise of "necessary and appropriate force," and therefore are authorized by the AUMF.

Id. at 521 (internal citations omitted).

United States, 976 F.2d 1328, 1334 (9th Cir. 1992) ("[N]o one can doubt that a state of war existed [during the 1991 Persian Gulf conflict] when our armed forces marched first into Kuwait and then into Iraq."); Rotko v. Abrams, 455 F.2d 992 (2d Cir. 1972), aff'g, 338 F. Supp. 46, 47 (D. Conn. 1971) (the FTCA "has been interpreted to apply to an undeclared war as well as a war which has been formally declared by Congress."). See also Minns v. United States, 974 F. Supp. 500, 506 (D. Md. 1997) (the 1991 Persian Gulf War, though undeclared by Congress, was a "time of war" under the FTCA); Vogelaar v. United States, 665 F. Supp. 1295, 1302 (E.D. Mich. 1987) ("Vietnam constitutes a war for purposes of the FTCA."); Morrison v. United States, 316 F. Supp. 78, 79 (M.D.Ga.1970) ("[A] war is no less a war because it is undeclared.").

While resort to legislative history is discouraged when the plain words of a statute speak without ambiguity, to the extent that the Shelton decision may raise questions about the meaning of its text, it is appropriate to look to the origins of the Suspension Act, (as did the Supreme Court in Bridges).  The Suspension Act came into being in 1921 as a temporary measure making an exception to the three-year statute of limitations on frauds committed against the United States during World War I.[21]  Bridges, 346 U.S. at 217.  As written, the Act extended the statute of limitations to six years in cases of "offenses involving the defrauding or attempts to defraud the United States or any agency thereof, whether by conspiracy or not, and in any manner, and not indictable under any existing

---

[21]The Act played a significant role in several of the McCarthy-era trials of members of the U.S. Communist Party, including the trial of Harry Bridges, the leader of the West Coast International Longshore and Warehouse Union and the defendant in the Supreme Court case under discussion.

statutes." Id. at 217 n.16.   Congress repealed the statute in 1927 after the DOJ announced that it contemplated no further prosecutions of fraud arising out of the World War I mobilization effort.  See id.

After the United States entered World War II, Congress reenacted the statute.  The 1942 version of the statute read:

> . . . the running of any existing statute of limitations applicable to offenses involving the defrauding or attempts to defraud the United States or any agency thereof, whether by conspiracy or not, and in any manner, and now indictable under any existing statutes, shall be suspended until June 30, 1945, or until such earlier time as the Congress by concurrent resolution, or the President, may designate.

Id. at 217 n.15. The Act was amended twice in 1944 to add specific references to wartime contracts and was finally codified in its present form in 1948.  As explained in the legislative history, the Suspension Act was intended to give the government sufficient time to investigate and prosecute pecuniary frauds committed while the nation was distracted by the demands of war.  What concerned Congress was "the exceptional opportunities to defraud the United States that were inherent in its gigantic and hastily organized [World War II] procurement program." Id. at 218.  As noted in the Senate Report accompanying the 1942 re-enactment:

> [d]uring normal times the present 3-year statute of limitations may afford the Department of Justice sufficient time to investigate, discover, and gather evidence to prosecute frauds against the Government.  The United States, however, is engaged in a gigantic war program.   Huge sums of money are being expended for materials and equipment in order to carry on the war successfully.  Although steps have been taken to prevent and to prosecute frauds against the Government, it is recognized that in the varied dealings opportunities will no doubt be presented for unscrupulous persons to defraud the Government or some agency.  These frauds may be difficult to discover as is often true of this type of offense and many of them may not come to

light for some time to come.  The law-enforcement branch of the Government is also busily engaged in its many duties, including the enforcement of the espionage, sabotage and other laws.

Id. at 219 n.18.

While the 1942 iteration of the Act contemplated its automatic termination at the conclusion of hostilities, the 1948 codification removed the sunset provision.  The Revision Notes to the 1948 re-enactment states: "The phrase 'when the United States is at war' was inserted at the beginning of this section to make it permanent instead of temporary legislation, and to obviate the necessity of reenacting such legislation in the future." Accordingly, it is clear from both the text and the legislative history that the "at war" provision of the Suspension Act was intended to capture any authorized military engagement that might compromise or impede the government's ability to investigate allegations of fraud.

That recognition, of course, still leaves open the question of when a military engagement becomes a "war" for purposes of the Act.  Certainly not every shot fired or every armed skirmish is of sufficient magnitude to stop the running of the statute of limitations.  In distilling the legislative history, the (albeit sparse) case law, custom and historical practice, as well as the teachings of common sense, the factors that a court should consider in deciding whether the United States is "at war" for purposes of the Act should include:  (1) the extent of the authorization given by Congress to the President to act; (2) whether the conflict is deemed a "war" under accepted definitions of the term and the rules of international law; (3) the size and scope of the conflict (including the cost of the related procurement effort); and (4) the diversion of resources that might have been

expended on investigating frauds against the government.  These are the criteria that the court will apply in answering the two questions posed by this case.[22]

(1)  The Congressional Authorization of "War" in Afghanistan and Iraq

Congress twice in two years confirmed (or at least, acknowledged) the President's power as Commander-in-Chief to send U.S. forces into combat abroad.  On September 18, 2001, Congress passed the AUMF, granting the President the power to use all "necessary and appropriate force" against "those nations, organizations or persons" responsible for the 9/11 attacks.[23]  Pub. L. No. 107-40, 115 Stat. 224.  Pursuant to that authorization, on October 7, 2001, the United States began military operations against the Taliban government of Afghanistan.  Without repealing or otherwise limiting the AUMF, Congress passed the Authorization for the Use of Military Force Against Iraq (AUMFAI) on October 11, 2002.  See Pub. L. No. 107-243, 116 Stat. 1498.  The AUMFAI authorized the use of military force, if necessary, to "remove from power the current Iraqi regime and promote the emergence of a democratic government to replace that regime," to defend the United States "against the continuing threat posed by Iraq," and to "enforce all relevant United

---

[22]The statute by its own terms does not limit itself to *a* war, but applies to situations where the United States is "at war," which encompasses simultaneous and/or overlapping military engagements.

[23]In the aftermath of the September 11, 2001 attacks on New York City and Washington, D.C., the President issued a Proclamation declaring the existence of a state of national emergency.  See Proclamation 7463, Declaration of National Emergency by Reason of Certain Terrorist Attacks, 66 Fed. Reg. 48,199 (Sept. 14, 2001).

Nations Security Council resolutions regarding Iraq." AUMFAI at 1501. The overt military campaign to oust Saddam Hussein began on March 20, 2003.[24]

While not formal declarations of war, the AUMFs signified the commitment of Congress "to pursue vigorously the war on terrorism through the provision of authorities and funding requested by the President." AUMFAI, at 1501. Each authorization specifically states that it is "intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution." AUMF at 224; AUMFAI at 1501. The authorizations recognized the "constitutional powers of the President as Commander-in-Chief to introduce United States Armed Forces into hostilities." The President in turn has submitted to Congress the reports the WPR requires. Thus, in practice, both political branches have treated the Iraq and Afghanistan conflicts as "wars" in any conventional sense of the term.

The judicial branch has done no differently. The Supreme Court, in addressing the issues raised by the detention of persons seized in Afghanistan and elsewhere as alleged "enemy combatants," has consistently invoked the legal presumption that the United States is at war. See, e.g., Hamdi, 542 U.S. at 519 ("[D]etention to prevent a combatant's return to the battlefield is a fundamental incident of waging war."). Cf. id. at 536 ("[A] state of war is not a blank check."). See also Boumediene v. Bush, 128 S.Ct. 2229, 2262 (2008) (the

---

[24]Defendants take issue with the measuring of the commencement of these "wars" (if they are such) from the dates of Congress's passage of the authorization resolutions. In defendants' view, the calculation of the tolling period from that point is flawed because it includes periods of time when the military was not actively engaged in combat. It is not clear how defendants would have the court identify hostilities of a sufficiently "active" nature to provide a bright line starting (or ending) the tolling period.

conflict with al Qaeda and other terrorist groups, "if measured from September 11, 2001, to the present, is already among the longest wars in American history."); Hamdan v. Rumsfeld, 548 U.S. 557, 631-632 (2006) (Common Article 3 of the Geneva Conventions is incorporated into the Uniform Code of Military Justice by its reference to the "laws of war").[25]

(2) Definitions of War and International Law

The idea that a formal declaration is an incident of a "true" or "lawful" war finds expression in Hugo Grotius's seminal treatise, The Law of War and Peace *(De jure Belli ac Pacis)*, first published in 1625 in the Netherlands.  Grotius wrote that

> [t]he reason why the nations required a declaration for the kind of war that was lawful by the law of nations was not what some writers state, namely, to keep the war-makers from doing something secretly or treacherously.  For that is a matter of displaying courage rather than a matter of law. Accordingly, we read that some nations even fixed beforehand the day and place of battle.

> The intention was rather to make it known of or certain that the war was not a private undertaking but was to be waged by the will of both peoples or of the heads of the peoples.  On this fact were based the special features which are not part of a war against pirates, or of one that a king wages against his subjects . . . .

> The same writers are mistaken too in the supposition that a war undertaken to defend oneself or one's property need no declaration.  It certainly needs one, not simply to justify itself, but in order to acquire those features to which we have already alluded . . .

---

[25]By acknowledging the binding force of the Geneva Convention on U.S. courts, the Supreme Court domesticated the international law principle that rules of war come into play not only in "cases of declared war," but also during any "armed conflict" involving a state actor.  See, e.g., Geneva Convention Relative to the Protection of Civilian Persons in Time of War of August 12, 1949, Part 1, Art. 2.

HUGO GROTIUS, THE LAW OF WAR AND PEACE 292-293 (Classics Club: Walter J. Black, Inc. 1949).

Without belaboring the point, it is almost impossible to find a more contemporary definition of "lawful" war that depends on a formal declaration for its existence.  Definitions rather emphasize the element of armed conflict, whether among States or between States and insurrectionary forces.  War:  "[A] contention between two or more States, through their armed forces, for the purposes of overpowering each other and imposing such conditions of peace as the victor pleases."  L.F.L. Oppenheim, Vol II, quoted in British Manual of Military Law, Part III at 5, n.2.  "[A state of war] exists whenever there is a resort to armed force between States or protracted armed violence between governmental authorities and organised armed groups or between such groups within a State."  Prosecutor v. Tadi, Judgment, Case No. IT-94-1-A, ¶ 70.  (International Criminal Tribunal for Former Yugoslavia (ICTY) App. Chamber, July 15, 1999).

Dictionary definitions of "war" are in accord.  WEBSTER NEW INT'L DICTIONARY 2871 (2d ed. 1934) (War:  "[A] contest between nations or states, carried on by force, whether for defence, for revenging insults and redressing wrongs, for the extension of commerce, for the acquisition of territory, for obtaining and establishing the superiority and dominion of one over the other, or for any other purpose; armed conflict of sovereign powers; declared and open hostilities.").  THE OXFORD ENGLISH DICTIONARY 887 (2d ed. 1989) (War: "Hostile contention by means of armed forces, carried on between nations, states, or rulers, or between parties in the same nation or state; the employment of armed forces against a foreign power, or against an opposing party in the state.").  See RANDOM HOUSE

DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED (2d ed. 1987) (War: "[A] conflict carried on by force of arms, as between nations or between parties within a nation; warfare, as by land, sea, or air."). Nowhere in these definitions is to be found the need for a formal declaration to establish the existence of a state of war (*ultima ratio regum*).

(3)  The Size and Scope of the Conflict

The use of force authorizations heralded a massive war effort that has required an enormous commitment of financial resources and manpower. The Congressional Research Service estimates that the costs of the Afghanistan and Iraq conflicts will total nearly $859 billion between FY2001 and the latter part of FY2009.[26] The Congressional Budget Office (CBO) has projected a total combined cost through FY2017 of between $1.2 trillion and $1.7 trillion.[27] Adjusted for inflation, that cost surpasses any other war in American history, with the exception of World War II.[28] Military involvement in Iraq alone,

---

[26]See Amy Belasco, Congressional Research Service, CRS Report for Congress: The Cost of Iraq, Afghanistan, and Other Global War on Terror Operations Since 9/11, at CRS-2, http://www.fas.org/sgp/crs/natsec/RL33110.pdf (updated July 14, 2008).

[27]The projections are based on two scenarios specified by Congressman John M. Spratt, Jr., Chair of the House Committee on the Budget. The first scenario assumes that the number of personnel deployed on the ground will be reduced from an average of 200,000 in FY2008 to 30,000 in FY2010, and will remain at that level through 2017. In the second scenario, the number of personnel will decline from 200,000 in 2008, to 75,000 to 2013, and then remain at that level through 2017. See Estimated Costs of U.S. Operations in Iraq and Afghanistan and of Other Activities Related to the War on Terrorism, statement of Peter Orszag, Director of the CBO Hearing Before the H. Comm. on the Budget, at 3 (October 24, 2007),
http://www.cbo.gov/ftpdocs/86xx/doc8690/10-24-CostOfWar_Testimony.pdf.

[28]These are the inflation-adjusted costs of other major U.S. military engagements: the Revolutionary War ($2.4 billion); the War of 1812 ($1.2 billion); the Mexican-American War ($1.7 billion), the Civil War ($66.7 billion); the Spanish-American War ($10.3 billion), World War I ($205.0 billion); the Korean War ($361.4 billion); the Vietnam War ($531.7

now over five years in duration, is longer than the U.S. involvement in World Wars I and II combined.

Another useful gauge of the scope of these conflicts is measured in the expenditure of military manpower, both in raw numbers and in casualties.  The exact number of those deployed is difficult to obtain, but troop strength for the combined hostilities averaged over 250,000 in 2007.[29]  Since 2001, over one million men and women in uniform have served in Iraq or Afghanistan, many of them on successive tours of duty.  The Department of Defense reported a total of 4,589 military casualties in the combined actions as of June of 2008.  That casualty figure surpasses the Revolutionary War (4,435), the War of 1812 (2,260), the Mexican War (1,733), the Indian Wars (1,000), the Spanish-American War (385), and the Persian Gulf War (147).[30]  The number of wounded soldiers – 32,135 as of June of 2008 – is over five times the number of wounded in the Revolutionary War (6,188), and over seven times the number of wounded in either the War of 1812 (4,505), or the Mexican War (4,152).[31]

(4)  Burden on Investigative Resources

---

billion); and the Persian Gulf War ($81.9 billion).  See War with Iraq: Costs, Consequences, and Alternatives, American Academy of Arts and Sciences (2002), http://www.amacad.org/publications/monographs/War_with_Iraq.pdf.

[29]See CRS Report, supra, at CRS-14 (updated July 14, 2008).

[30]See America's Wars, Department of Veterans Affairs, http://www1.va.gov/opa/fact/docs/amwars.pdf.

[31]See Department of Defense Personnel and Military Casualty Statistics, Statistical Information Analysis Division, http://siadapp.dmdc.osd.mil/personnel/MMIDHOME.HTM

The 9/11 attacks precipitated a massive reorganization of the U.S. Government to cope with the threat posed by terrorists in general and radical Islamists in particular.[32]  To counter that threat, Congress enacted a number of measures, included the USA PATRIOT Act, the revamping of the Foreign Intelligence Surveillance Act (FISA), and the creation of the Department of Homeland Security (DHS).[33]  The intensity of these initiatives, the government argues, has hampered its ability to investigate traditional types of crimes, including fraud.  According to a June 22, 2006 White Paper issued by DOJ's Counterterrorism Unit:

> The events of September 11 transformed the mission of the Department of Justice.  The Department revised its Strategic Plan to emphasize the prevention and disruption of terrorism.  Indeed, the protection of our national security and the prevention of terrorist acts are our number one goal.  On every level, we are now committed to a new strategy of prevention.  This includes the design, implementation and support of policies and strategies, including investigation and prosecution of terrorism and terrorism-related

---

[32]The political climate in the aftermath of the 9/11 attacks was not unlike that prior to the enactment of the first Suspension Act in 1921.  In 1917, the Bolsheviks, having seized power in Russia, announced their intention to lead a worldwide communist revolution.  A "Red Scare" gripped the nation after newspapers uncovered an assassination plot aimed against several prominent national figures, including cabinet members, Justice Holmes, John D. Rockefeller, and J.P. Morgan.  It reached its zenith after a wave of terrorist bomb attacks across the country, including one on Wall Street that killed dozens.  Congress responded with laws to combat threats of espionage, treason, and sedition.  Attorney General Palmer, himself a near-victim of an anarchist bombing, authorized the nationwide arrests of some 10,000 suspected subversives and radicals.  The Department of Justice (DOJ) devoted significant resources to the prosecutions of alleged Communists, syndicalists, anarchists, and others.  A General Intelligence Division was established to collect and store information on subversive activity.  A young recent law graduate, J. Edgar Hoover, was named as its head.

[33]The DHS includes twenty-two agencies and employs nearly 200,000 employees.  The federal government arguably has not undergone a larger reorganization since the merger of the Department of War and the Department of Navy into the Department of Defense in 1947.  See National Security Act of 1947, 50 U.S.C. § 401 et seq.

cases and the pursuit of legislative initiative, which will prevent, disrupt and defeat domestic and international terrorist operations before they occur.[34]

Pursuant to the Strategic Plan, the FBI undertook a major reorganization, shifting its resources from the investigation of conventional crime to terrorism.[35]

This shift in focus is reflected in the number and nature of the prosecutions brought by DOJ.  Since the fall of 2001, the FBI has referred more than 7,000 terrorism cases to DOJ.  Over 2,000 of these cases have resulted in prosecutions.  At the same time, the overall number of criminal prosecutions credited to the FBI has dropped by more than 30 percent (from 19,000 to 12,700 cases).   The sharpest declines have been in the prosecution of white-collar and organized crime.[36]  While the government has not offered

---

[34]See Counterterrorism White Paper, at 6, June 22, 2006, http://trac.syr.edu/tracreports/terrorism/169/include/terrorism.whitepaper.pdf.

[35]The FBI inaugurated a Counterterrorism Division, a National Security Branch, and a National Joint Terrorism Task Force.  The DOJ Inspector General estimates that approximately 2,400 agents that were transferred from traditional crime programs to counterterrorism squads have not been replaced.  See OIG Report, supra, at Chapter 13, http://www.usdoj.gov/oig/reports/FBI/a0537/index.htm. The DOJ established its own Anti-Terrorism Advisory Council (ATAC), consisting of senior prosecutors drawn from each of the ninety-four United States Attorney's Offices.

[36]White-collar crime referrals have dropped from nearly 10,000 cases in 2000, to approximately 3,500 in 2005.  During the same period, terrorism prosecutions rose 26 percent.

Our analyses of on-board agent data indicated that there were approximately 20 percent fewer agents investigating white collar crime matters in FY 2003 than in FY 2000. In addition, 8 of the 30 decreasing investigative classifications identified involved white-collar crime matters. Specifically, we noted that the most significant agent utilization reductions occurred in telemarketing fraud, health care fraud, and insurance fraud. We also noted reductions in classifications pertaining to financial institution fraud, environmental crimes, bankruptcy fraud, and wire fraud. In terms of allocated positions, the FBI reduced the number of funded agent positions assigned

any evidence that the CA/T investigation was directly affected by this shift in resources, it is not required to do so.  The Suspension Act requires only that the government show that the United States is at war, and that the government's ability to investigate and prosecute pecuniary frauds has been hampered as a result.

Termination of Hostilities

The tolling provisions of the Suspension Act apply "until three years after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress."  As the government posits, a strong case can be made, given the continuing expenditures and loss of life in Iraq and Afghanistan, that the United States remains at war.  It is nonetheless incumbent on the court, under the test it proposes, to identify a clear demarcation point at which the tolling provisions of the Suspension Act cease to run. Traditionally, the end of a war is marked by the signing of a formal peace treaty.  However,

---

to investigate white collar crime in the majority of field offices. From FYs 2000 to 2003, the FSLs for the WCC Program decreased by 157 agent positions.

Office of Inspector General, Report on Internal Effects of the Federal Bureau of Investigation's Reprioritization, (OIG Report), at Chapter 4, http://www.usdoj.gov/oig/reports/FBI/a0439/index.htm. See also Fox Butterfield, As Cities Struggle, Police Get By with Less, N.Y. Times, July 27, 2004, at A10 (noting the increasing pressure on local police departments due to budget cuts and increased responsibility); Gary Fields & John R. Wilke, FBI's New Focus Places Burden on Local Police, Wall St. J., June 30, 2003, at A1 (reporting that "police departments across the country must fill the void left by reassigned FBI agents"); Jess Bravin & Chris Adams, Justice Department to Shift Resources to Terror Focus, Wall St. J., Nov. 9, 2001, at A4 (noting the FBI "plans to shift about half of its 805 agents assigned to local-crime task forces to counterterrorism work" and that Department of Justice "prosecutors w[ill] put thwarting terror attacks above convicting criminals"); Tim Johnson, War on Drugs Loses Out to War on Terror, Phil. Inq., Nov. 7, 2001, at A3 (noting resources of FBI and Coast Guard, among other agencies, are being redeployed to fight terrorism instead of being used for other missions, such as drug enforcement).

formal surrenders like those of Germany and Japan at the end of World War II, like formal declarations of war, are the modern exceptions.  The end of more recent conflicts have been signaled by Presidential pronouncement or by the diplomatic or de jure recognition of a former belligerent or a newly constituted government.  On July 27, 1953, for example, an Armistice Agreement with North Korea was followed by a proclamation by President Eisenhower that the "carnage of war is to cease and the negotiation of the conference table is to begin."

On December 22, 2001, the United States formally recognized and extended full diplomatic relations to the new government of Hamid Karzai.[37]  That recognition signaled the cessation of a state of war with Afghanistan.  Accordingly, the statute of limitations with respect to the Afghan conflict, expired on December 22, 2004.[38]  Similarly, on May 1, 2003,

---

[37]By December 7, 2001, the last of the Taliban had fled Kandahar.  Subsequently, the United Nations convened a group of twenty-five Afghans (including two women) that met in Bonn, Germany.  The Agreement on Provisional Arrangements in Afghanistan Pending the Re-Establishment of Permanent Government Institutions (Bonn Agreement) was the initial series of agreements intended to re-constitute the government of Afghanistan.  See The Secretary-General, Letter Addressed to the President of the Security Council, U.N. Doc. S/2001/1154 (Dec. 5, 2001).  Among other things, it established the Afghan Interim Authority (AIA), of which Karzai was the chairman.  The AIA took charge of the country for six months until a Loya Jirga (grand council) formed a new Transitional Administration on June 13, 2002.  Karzai was appointed interim president.  A Constitutional Loya Jirga drafted a new constitution, which was formally adopted on January 4, 2004.  Karzai was elected as president of the permanent government on October 9, 2004.  Importantly, the Bonn Agreement also authorized an international peace keeping force to maintain security in Kabul.  The peacekeeping force was formally authorized by UN Security Council Resolution 1386.  See S.C. Res. 1386, U.N. Doc. S/RES/1386 (Dec. 20, 2001).  US military actions against Taliban and al Qaeda suspects in Afghanistan since that date to have been undertaken with the formal consent of the Karzai government.

[38]Secretary of Defense Donald Rumsfeld also announced an end to major combat operations in Afghanistan on May 1, 2003.

President Bush, while aboard the USS *Abraham Lincoln*, proclaimed that "[m]ajor combat operations in Iraq have ended.  In the Battle of Iraq, the United States and our allies have prevailed.  And now our coalition is engaged in securing and reconstructing that country."[39]  Consequently, with regards to the Iraq conflict, the statute of limitations expired on May 1, 2006.[40]

ORDER

For the foregoing reasons, the motion to dismiss is <u>DENIED</u>.  The AUMF, which authorized the Afghanistan War, tolls the limitations period from September 18, 2001, to December 22, 2004.  The Iraq War Authorization tolls the limitations period from October 10, 2002, to May 1, 2006.  The court therefore will deem the Suspension Act to toll the limitations period for defendants' alleged offenses from September 18, 2001, to May 1, 2006.

SO ORDERED.

/s/ Richard G. Stearns

---

[39]Not coincidently, the Defense Department classifies March 19, 2003 - April 30, 2003, as the "Combat Operations" stage of Operation Iraqi Freedom.  By comparison, May 1, 2003, is categorized as "Post Combat Operations" for purposes of measuring casualties.  <u>See</u> http://www.defenselink.mil/news/casualty.pdf.

[40]Although not affecting this discussion, it is worth noting that an amendment to the Suspension Act was introduced in the Senate Committee on the Judiciary on April 17, 2008.  The proposed amendment states, *inter alia*, that "[f]or purposes of applying such definitions in this section, the term 'war' includes a specific authorization for the use of Armed Forces, as described in section 5(b) of the War Powers Resolution (50 U.S.C. § 1544(b))."  <u>See</u> 2007 Cong. US S. 2892.  An identical amendment was introduced in the House on May 19, 2008.  <u>See</u> 2007 Cong. US HR 2642.  If enacted, the AUMF and the Iraq Authorization would plainly trigger the Suspension Act because each specifically states that it is "intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution." AUMF, at 224.

32

_____
UNITED STATES DISTRICT JUDGE